JEANNE HOPF *et al.*, Plaintiffs-Appellants, v. TOPCORP, INC., *et al.*, Defendants-Appellees.

First District (5th Division)    No. 1—92—0773

Opinion filed November 12, 1993.

Marshall Patner & Associates, P.C., of Chicago (Marshall Patner, David I. Hurwitz, and Jeremy W. Hobbs, of counsel), and Richard Stillerman, of Evanston, for appellants.

Mayer, Brown & Platt, of Chicago (Michelle Odorizzi, Priscilla P. Weaver, and Jeffrey S. Kinsler, of counsel), for appellees.

JUSTICE COUSINS delivered the opinion of the court:

Plaintiffs appeal from the circuit court's order granting summary judgment in favor of defendants. The action was brought to compel two Illinois corporations to comply with the provisions of the Illinois Open Meetings Act and the Illinois Freedom of Information Act (FOIA). (Ill. Rev. Stat. 1985, ch. 102, par. 41 *et seq.*; Ill. Rev. Stat. 1985, ch. 116, par. 201 *et seq.*) Plaintiffs are citizens, residents and taxpayers of Evanston, Illinois (the City). Defendants are Topcorp, Inc. (Topcorp), and Research Park, Inc. (RPI), for-profit corporations organized pursuant to a statement of understanding entered into by the City of Evanston (City) and Northwestern University (Northwestern) for the purpose of jointly developing a research park on property located in downtown Evanston.

In 1987, plaintiffs moved for a preliminary injunction and the circuit court denied their motion. Plaintiffs appealed and this court affirmed in a two to one decision, *Hopf v. Topcorp, Inc.* (1988), 170 Ill. App. 3d 85 (*Hopf I*). The majority found that plaintiffs had not carried their burden of showing a likelihood of success on the key issue in this case: whether Topcorp and RPI are "subsidiary bodies" of the City of Evanston and, therefore, "public bodies" that are subject to the requirements of the Open Meetings Act and FOIA.

Following remand and additional discovery, the parties filed cross-motions for summary judgment. Holding that Topcorp and RPI were not public bodies, the circuit court granted defendants' motion for summary judgment and denied plaintiffs' motion for summary judgment.

We affirm.

## BACKGROUND

### INTRODUCTION

In 1982, the City adopted a 20-year, mixed-use office development plan for downtown Evanston entitled "Downtown II." As part of this redevelopment plan, the City established a tax increment financing district to pay for public improvements in the infrastructure of the area targeted for redevelopment. In 1982 and 1983, the City and Northwestern held discussions about the possibility of participating in joint economic development projects in Evanston. Northwestern offered to make university-owned land within the Downtown II area available for a research park as a joint venture with the City. In 1986, after three years of negotiations, the City and Northwestern entered into a statement of understanding that set forth the basic guidelines under which the research park was to be developed.

The statement of understanding contemplated the creation of two private corporations to implement its stated goals. Accordingly, on June 17, 1986, Topcorp and RPI were incorporated as for-profit corporations under the Business Corporation Act of 1983 (Ill. Rev. Stat. 1985, ch. 32, par. 1.01 *et seq.*).

### THE FUNCTIONS PERFORMED BY TOPCORP AND RPI

Topcorp was created primarily to acquire the land within the area designated as the research park and make it available for development. In October 1986, Topcorp entered into a written agreement with Northwestern and the City to purchase over time the various parcels of land that will comprise the research park. Before the City signed the contract, it was submitted to the city council for its approval at an open meeting held after public notice. In the contract, Topcorp agreed to pay the seller (either Northwestern or the City) the greater of the parcel's cost to the seller or its appraised value. The agreement further provided that the relatively small portion of the research park area that was then owned by individuals or entities other than Northwestern or the City would be acquired by the City, either through purchase, eminent domain or otherwise, and then sold to Topcorp.

RPI was created to serve as the operating entity that is responsible for developing the park by negotiating for the sale or lease of the land to developers or users of the property. In addition, RPI has the task of promoting interest in the park, marketing it to prospective tenants, making management and maintenance arrangements, securing site development plans, and otherwise overseeing its operation.

### Corporate Structure and Control of Topcorp and RPI

Topcorp has 200 shares of capital stock outstanding: 100 shares are owned by Evanston, and 100 shares are owned by Northwestern. Neither the City nor Northwestern may sell its shares without the consent of the other. Each class is entitled to elect three directors to Topcorp's six-member board of directors; no cumulative voting rights exist. The City-designated directors are the Evanston mayor, an alderman, and the city manager.

RPI is a wholly owned subsidiary of Topcorp. The City and Northwestern are both entitled to appoint half of the 14 directors on the RPI board. The directors serve staggered three-year terms and may not be removed during their terms except by action of the RPI board. The City directors are appointed by the mayor with the consent of the city council, but the City-designated directors need not be public officials. As of June 1989, six of the seven RPI board members appointed by the City were private citizens; the seventh was an alderman.

The executive director of RPI is Ronald L. Kysiak, a private citizen whose salary is paid by Evanston Inventure, an entity made up and funded largely by private local businesses and by a contribution from the City. Initially, RPI's staff consisted of seven full- and part-time employees on loan from Northwestern, whose services Northwestern provided to RPI on a *pro bono* basis. By March 1990, RPI had hired three people who served on its staff as independent contractors, but also retained several Northwestern employees on staff.

During the early stages of the project, Evanston's assistant city manager, Judith Aiello, provided general administrative assistance to RPI on a *pro bono* basis. By 1991, however, Aiello's assistance to RPI had been greatly reduced.

RPI has full control over its employees and has the right to dismiss them and to hire additional employees. RPI's employees are not paid by Evanston. Likewise, they are not subject to State regulations regarding public employees, and they are not eligible for State retirement or insurance benefits.

## FUNDING OF TOPCORP AND RPI

Although the private sector is expected to provide the majority of the funding for the actual development of the research park, the initial plans estimate public expenditures of almost $24 million. Testimony adduced below established that projections indicate that the private sector will contribute $6 toward development for every $1 of public funding. Pursuant to the statement of understanding, the City and Northwestern are to equally absorb the operating costs incurred by Topcorp and RPI. In 1986, the City expended $50,000 for such expenses. RPI submitted a $500,000 operating budget to the City for 1987 and the City appropriated its $250,000 share after public debate and approval by the city council.

From March 1983 through April 1991, the City spent approximately $6.9 million on expenses related to the research park, including $812,500 for the capitalization and operation of Topcorp and RPI. The City and Northwestern continue to contribute approximately $250,000 annually to Topcorp to fund RPI's operating expenses. In addition, in 1990, the City and Northwestern each guaranteed $150,000 of a $300,000 loan that RPI obtained to rehabilitate a warehouse that was to be used as a small business incubator.

## PUBLIC INVOLVEMENT

Since the inception of the research park project, the City's involvement in the project has been subject to public scrutiny. In January 1986, the statement of understanding was publicly debated, voted on, and approved by the Evanston city council in an open meeting. Similarly, in March 1986, a resolution was passed by the city council at a public meeting, setting forth the criteria for exercising the City's right to elect half of the directors on the Topcorp and RPI boards. Appropriations of City funds are publicly debated and decided. Condemnation proceedings and decisions with respect to the relocation of residents or businesses displaced by the project have been and will continue to be conducted by the City according to the rules governing public bodies. Finally, City officials periodically submit progress reports to the city council. These reports provide information to both the council and the public about the progress of construction and leasing activities undertaken by RPI and the private developer, as well as the land acquisition and capital improvements undertaken by the City.

In contrast to the City, Topcorp and RPI have operated from the outset as private corporations. RPI and Topcorp have conducted their board meetings and business negotiations in a private manner and

have not made minutes of meetings or other documents available to the public.

At the preliminary injunction hearing in 1987, William Ihlanfeldt, who was vice-president for institutional relations and dean of admissions at Northwestern testified on behalf of Topcorp and RPI. Ihlanfeldt opined that compliance with the Open Meetings Act and FOIA would impair the research park's ability to attract tenants and might make it impossible for the project to succeed. He testified that RPI had been negotiating with several prospective tenants, including electronics, pharmaceutical and manufacturing firms, and that those prospective tenants typically insisted that negotiations remain confidential because they feared being put at a competitive disadvantage if they were required to disclose the nature of the research they were conducting.

PROCEDURAL HISTORY

On April 24, 1987, plaintiffs filed this suit seeking to have Topcorp and RPI declared public bodies subject to the Open Meetings Act and FOIA. Plaintiffs moved for a preliminary injunction which the circuit court denied on June 3, 1987.

Plaintiffs then filed an interlocutory appeal and this court affirmed in a two to one decision, *Hopf I* (170 Ill. App. 3d 85). In that appeal, this court determined that the only relevant issue was whether plaintiffs could demonstrate a likelihood of success on their contention that Topcorp and RPI were "subsidiary bodies" of the City and, therefore, "public bodies" subject to compliance with the Open Meetings Act and FOIA. (*Hopf*, 170 Ill. App. 3d at 91.) As this court noted in *Hopf I*, the considerations relevant to the determination of whether an entity is a "subsidiary body" are set forth in *Rockford Newspapers, Inc. v. Northern Illinois Council on Alcoholism & Drug Dependence* (1978), 64 Ill. App. 3d 94. The *Rockford* test requires the court to consider three factors: (1) whether the entity has a legal existence independent of government resolution; (2) the nature of the functions performed by the entity; and (3) the degree of government control exerted over the entity. *Rockford*, 64 Ill. App. 3d at 96-97.

In *Hopf I*, this court determined that the record supported the following findings of fact made by the circuit court: (1) Topcorp and RPI were privately incorporated; (2) the function of Topcorp was to purchase land from the City and Northwestern; (3) the function of RPI was to oversee the private development of the real estate; and (4) the respective boards and employees of Topcorp and RPI were independent of direct government control. (*Hopf*, 170 Ill. App. 3d at 92.) This court concluded that under the *Rockford* test, the plaintiffs had

not demonstrated a likelihood of success on the merits. Therefore, we held that the circuit court did not abuse its discretion in denying plaintiffs' request for a preliminary injunction.

The parties then returned to the circuit court and conducted additional discovery. Defendants filed a motion for summary judgment. Plaintiffs cross-moved for summary judgment, agreeing that the material facts were not in dispute, but arguing that those facts demonstrated that Topcorp and RPI were "public bodies" and, therefore, should be subject to the Open Meetings Act and the FOIA. The circuit court granted summary judgment in favor of Topcorp and RPI, and denied plaintiffs' motion for summary judgment. This appeal followed.

ANALYSIS

Because plaintiffs appeal from an order of summary judgment, we apply the *de novo* standard of review to the decision below. *Quality Lighting, Inc. v. Benjamin* (1992), 227 Ill. App. 3d 880, 884; *Demos v. National Bank* (1991), 209 Ill. App. 3d 655, 659.

■ The Illinois Open Meetings Act defines a "public body" to include:

> "all legislative, executive, administrative or advisory bodies of the state, counties, townships, cities, villages, incorporated towns, school districts and all other municipal corporations, boards, bureaus, committees or commissions of this State, and *any subsidiary bodies* of any of the foregoing including but not limited to committees and subcommittees which are supported in whole or in part by tax revenue, or which expend tax revenue, except the General Assembly and committees or commissions thereof." (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 102, par. 41.02.)

The Illinois Freedom of Information Act contains a substantially identical definition of a "public body." See Ill. Rev. Stat. 1985, ch. 116, par. 202(a).

■ As in the prior appeal, plaintiffs do not claim that Topcorp and RPI constitute legislative, executive, administrative, or advisory bodies of State or local government. Thus, the only issue before this court is whether the two corporations are "subsidiary bodies" of the City as that term is used in both Acts.

As before, the *Rockford* test provides the focus for our inquiry. The evidence relating to the three factors set forth in *Rockford* is essentially the same as it was in the previous appeal. First, Topcorp and RPI were and remain incorporated under the Illinois Business Corporation Act. Second, the functions of the two corporations remain proprietary: Topcorp purchases land and acts as a holding company

for RPI; RPI develops the land and then markets space in the research park to potential tenants. Finally, the corporate structure of the two corporations is unchanged: both the City and Northwestern own one-half of the outstanding shares and appoint one-half of the directors. Although both the City and Northwestern are able to *influence* the direction and decisions of the two corporations through their appointment power, neither the City nor Northwestern can *control* the two corporations.

However, plaintiffs argue that additional evidence revealed during discovery after remand indicates that the City does exercise control through its "veto power" and that the City is actively involved in the day-to-day activities of Topcorp and RPI. Plaintiffs assert that the record now shows:

    1. The three Topcorp directors appointed by the City (the mayor, city manager and alderman) voted as a bloc on a preliminary agreement between RPI and a private company to develop the research park, and dictated to RPI their requirements for the final contract.

    2. The city manager negotiated, on behalf of the City, the terms of the master agreement to sell real estate to Topcorp, then voted to approve the agreement as a Topcorp director, along with Mayor Barr and Alderman Davis, the other two City appointees.

    3. The three City-appointed Topcorp board members discuss the business of Topcorp and RPI among themselves in between board meetings.

    4. City-appointed board members of Topcorp and RPI served on every operating committee of the corporations.

    5. Judith Aiello, the assistant city manager, was designated by RPI in its documents as an RPI staff member. Aiello performed administrative duties for RPI, attended meetings of RPI's board and various committees, and offered ideas and gave input into RPI's activities. The city manager in a letter to RPI's executive director, designated Aiello as the City's "point person" for RPI.

    6. Neither Topcorp nor RPI has any real assets. The City, in addition to funding defendants' operating budgets in the amount of $812,500 to date, guaranteed one-half of a $300,000 loan to RPI for improvement of tenant space in the research park.

With respect to items 1 through 3, plaintiffs essentially argue that the City is able to control the decision-making process of Topcorp and RPI through the actions of its appointed directors. According to plaintiffs, the City appointees on the Topcorp board vote as a bloc and, therefore, are able to exercise a "veto" power over Topcorp's operations.

Initially, plaintiffs direct our attention to a letter sent to the RPI

board by the City appointees to the Topcorp board and argue that the letter indicates that the City used its voting strength to dictate terms to Topcorp and RPI. This letter was prompted by RPI's request for consent by the Topcorp board to a preliminary memorandum agreement between RPI and a private developer; Topcorp's consent was necessary because the memorandum affected its interests. The three City appointees to the Topcorp board gave their consent, but noted a number of areas of concern. For example, they indicated that the final agreement should protect Topcorp against having to sell property to the developer at a price that was lower than the price Topcorp was obligated to pay either the City or Northwestern. The board members also suggested, *inter alia*, that limitations on budget increases for the private developer be discussed and conditions under which the private developer could extend the final closing date be negotiated.

We disagree with plaintiffs' characterization of this letter. The letter indicates that Topcorp board members are concerned about safeguarding the welfare of their corporation. The letter does not demonstrate that the City controls Topcorp or RPI.

Next, plaintiffs argue that the City's ability to dictate terms to Topcorp is demonstrated by the fact that the City manager negotiated an agreement with Topcorp for the purchase of land from both the City and Northwestern, and then voted on it as a Topcorp director. However, there is no evidence that the City insisted on certain terms in that agreement or that there was ever any dispute about what the terms ought to be. The agreement simply reiterates the terms that had already been agreed upon between Northwestern and the City in the statement of understanding. The statement of understanding contains the critical terms: the purchase price to be paid, the terms of the purchase money note to be given to the seller by Topcorp, and the acquisition schedule.

Finally, plaintiffs point to testimony that indicates that the City appointees confer with each other before board meetings. We remain unconvinced. The fact that board members confer with each other prior to meetings does not demonstrate that the Topcorp directors were engaging in bloc voting.

With respect to item 4, plaintiffs assert that the City is able to control the decision-making process of Topcorp and RPI via the City appointees' membership on the corporations' operating committees. However, the record indicates otherwise.

Topcorp has only one committee, a budget committee, and both the City and Northwestern are equally represented on this committee. RPI's board of directors has five committees: an executive committee

and four subject area committees (finance; minority business education and training; environment and safety; and development). Evanston appointees do not constitute a majority on any committee except the minority business education and training committee.

Next, in item 5, plaintiffs argue that Judith Aiello, a City employee, is a staff member of RPI and through her the City participates in the day-to-day activities of RPI. Again, the record does not support plaintiffs' assertions.

Aiello testified that during the early stages of the project, she provided general administrative assistance to RPI on a *pro bono* basis. By June 1991, Aiello's assistance to RPI had been greatly reduced. She no longer attended committee meetings and attended meetings of the RPI board of directors only if requested to do so in order to provide information about the City's progress in meeting its obligations with respect to land acquisition and infrastructure improvements. Aiello testified that while she was referred to in some documents as RPI "staff" she was never officially a staff member of RPI and was never compensated for her assistance to RPI.

Finally, in item 6, plaintiffs assert that the amount of City funding provided to Topcorp and RPI renders the corporations subsidiary bodies of the City. In *Hopf I*, this court noted that although the amount of public funds contributed to the entity in question is a factor to be considered, a large percentage of public funding alone will not create a "subsidiary body." (*Hopf*, 170 Ill. App. 3d at 91.) Furthermore, the nature of the financial involvement should be considered. *Hopf*, 170 Ill. App. 3d at 91.

The *Rockford* decision is also instructive on the issue of funding. In *Rockford*, the court held that the defendant was exempt from the Open Meetings Act despite the fact that 90% of the corporation's funding came from government sources, and stated:

> "The amount or percentage of governmental funding of a private entity should have no bearing on whether that entity is characterized as a subsidiary for purposes of the Open Meetings Act. Although the Act itself provides that a particular entity need not be publicly funded in order to be required to hold open meetings, it does not state that public funding alone will make a particular entity subject to the Act. To imply such a statutory intent would [a]ffect large numbers of completely private entities that receive a large portion of their funding from the State." *Rockford*, 63 Ill. App. 3d at 96.

In the instant case, the majority of the funds that the City has expended were not used to operate Topcorp and RPI, but instead were used to make infrastructure improvements to the area where

the research park is located. Similarly, the cost of land acquisitions does not constitute government funding of Topcorp and RPI; the City does not donate this land to Topcorp, but instead sells the land to Topcorp. While the terms of the sale are favorable to Topcorp, the City does expect to recoup its investment and recover a profit if the venture is successful. The only direct government support that the corporations receive is the City's annual contribution of $250,000, which is matched by Northwestern. Thus, the City contributes 50% of the corporations' funding. This contribution, in and of itself, does not render the corporations public bodies. See *Hopf*, 170 Ill. App. 3d at 91.

In sum, the alleged new evidence of City control and involvement in the day-to-day operations of the two corporations is unpersuasive. Therefore, the circuit court properly granted summary judgment for defendants.

Affirmed.

MURRAY and McNULTY, JJ., concur.